IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| THEODORE MARCUS FRIERSON, III | CASE NO. 1:22-cv-00899-CAB |
| Plaintiff, | DISTRICT JUDGE CHRISTOPHER A. BOYKO |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Theodore Marcus Frierson, III filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

## Procedural Background

In February 2018, Frierson filed an application for disability insurance benefits, alleging a disability onset date[1] of July 6, 2017. Tr. 274–77. He claimed that he was disabled due to post-traumatic stress disorder (PTSD),

---

[1]    "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

fibromyalgia,[2] and multiple sclerosis.[3] Tr. 104–105. The Commissioner denied Frierson's applications at the initial level and upon reconsideration. Tr. 161–63, 165–67. Frierson requested a hearing before an ALJ. Tr. 168–69.

In July 2019, ALJ George Roscoe held a hearing at which Frierson and vocational expert Paula Zinsmeister testified. Tr. 48–72. In July 2019, ALJ Roscoe issued a written decision finding that Frierson was not disabled. Tr. 137–150. Six months later, the Appeals Council vacated that decision and remanded the matter for an ALJ to obtain additional evidence of Frierson's impairments, further consider Frierson's residual functional capacity (RFC),[4] and clarify the effect of Frierson's assessed limitations. Tr. 157–58.

In March 2021, ALJ Roscoe held a hearing on remand at which Frierson and vocational expert George Coleman testified. Tr. 73–103. In April 2021, ALJ Roscoe issued a written decision finding that Frierson was not disabled. Tr.

---

[2]  Fibromyalgia is a chronic health condition that causes musculoskeletal pain and fatigue. *Fibromyalgia*, Cleveland Clinic Health Library, Diseases & Conditions (last visited Feb. 15, 2023), https://my.clevelandclinic.org/health/diseases/4832-fibromyalgia.

[3]  Multiple sclerosis is an autoimmune disease in which the immune system attacks cells in the myelin, a protective sheath that surrounds the nerves in the brain and spinal cord. *Multiple Sclerosis (MS)*, Cleveland Clinic Health Library, Diseases & Conditions (last visited Feb. 15, 2023), https://my.clevelandclinic.org/health/diseases/17248-multiple-sclerosis.

[4]  An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard c. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it is the Social Security Agency's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

12–41. In March 2022, the Appeals Council declined further review and ALJ Roscoe's decision became final. Tr. 1–3, *see* 20 C.F.R. § 404.981. Frierson filed the instant action in May 2022. Doc. 1.

## Factual background

*Personal and vocational evidence.* Frierson was born in January 1971 and was 46 years old on the onset date of his alleged disability. Tr. 34. Frierson has a high school education. Tr. 34. He used to work as a security guard, a supervisor in a prison cafeteria, and a physical laborer and inventory manager at a warehouse. Tr. 51–53. Frierson was last insured on December 31, 2022.[5] Tr. 17; Doc. 9, at 9.

*Physical health impairment evidence.*[6] In early November 2015, two years before Frierson's alleged disability onset date, Alfred Haight, D.O., conducted medical resonance imaging (MRI) of Frierson's brain. Tr. 490. Dr. Haight's findings were consistent with a demyelinating disease such as multiple sclerosis.[7] *Id.* Dr. Haight described Frierson as stable and noted that

---

[5]     To be entitled to disability insurance benefits, a claimant must be a wage-earner who accumulated sufficient earning credits and became disabled before the end of his or her insured date. *See, e.g.,* 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1988); *Soc. Sec. Disab. Claims Prac. & Proc.* § 5:3 (2nd ed. 2022).

[6]     The recitation of medical evidence is not intended to be exhaustive; I have summarized pertinent information from the parties' recitation of facts.

[7]     A demyelinating disease is any condition that causes damage to the protective myelin sheath that surrounds the nerve fibers in the brain, optic nerves, and spinal cord. Jerry W. Swanson, M.D., *Demyelinating disease: What can you do about it?,* Mayo Clinic (Mar. 2, 2023), https://www.mayoclinic.org/

he did not observe any "areas of abnormal enhancement," indicating active demyelination. *Id.*

In late November 2015, Jennifer Sommer, D.O., reviewed an MRI of Frierson's cervical spine and found nonspecific results that were compatible with a history of demyelinating disease and showed "[v]ery mild degenerative changes." Tr. 491.

In mid-April 2017, Frierson began seeing rheumatologist Inderprit Singh, M.D., after an emergency department physician recommended that Frierson secure ongoing care for his multiple sclerosis. Tr. 505–06. Dr. Singh's examination revealed that Frierson had diffuse myofascial tenderness and tender points. Tr. 507.

In late April 2017, Frierson saw physician Jouliana Naim Janineh, D.O., for knee pain. Tr. 386–90. Dr. Janineh noted her suspicion that Frierson had osteoarthritis based on his symptoms of arthralgia,[8] joint swelling, and decreased range of motion. Tr. 389. X-rays later confirmed that Frierson had mild patellofemoral[9] osteoarthritic changes in his knees. Tr. 380.

---

diseases-conditions/multiple-sclerosis/expert-answers/demyelinating-disease/faq-20058521. When the myelin sheath is damaged, nerve impulses slow or even stop, resulting in neurological problems. *Id.* Multiple sclerosis is a common demyelinating disease. *Id.*

[8]  Arthralgia is joint stiffness. *Arthralgia*, Johns Hopkins Health, Conditions and Diseases (last visited Feb. 15, 2023), https://www.hopkinsmedicine.org/health/conditions-and diseases/arthralgia.

[9]  Patellofemoral means pertaining to the patella and the femur. Dorland's Illustrated Medical Dictionary 1395 (32nd ed. 2012).

4

In March 2017, radiologist Ramez Malaty, M.D., reviewed an MRI of Frierson's brain and found "multiple white matter hyperintense lesions," some of which "extended to the subependymal surface."[10] Tr. 598. He found no evidence of new or enhancing lesions. Tr. 597.

In early May 2017, Frierson saw Dr. Singh and indicated that he hadn't gone to work that day due to increased pain in his joints. Tr. 514.

A few days later, Dr. Malaty reviewed an MRI of Frierson's spine. Tr. 592–96, 964. In Frierson's thoracic spine, Dr. Malaty observed "mild endplate degenerative changes." Tr. 592–94. In Frierson's cervical spine, Dr. Malaty observed "mild endplate degenerative changes" and "mild bulges or protrusions" between his vertebrae at C5 to C6 and C6 to C7; those at C5–C6 were minimally larger as compared to the previous year.[11] Tr. 592–93.

In November 2017, radiologist Roy R. Rice, Jr., reviewed MRIs of Frierson's knees. Tr. 587–92. In Frierson's left knee, Dr. Rice observed mild

---

[10]    The subependymal surface is the layer of cells just under the ependyma, a thin membrane that lines fluid-filled spaces in the brain and spinal cord. *[S]ubependymal*, National Cancer Institute, NCI's Dictionary of Cancer Terms (last visited Feb. 22, 2023), https://www.cancer.gov/publications/dictionaries/cancer-terms/def/subependymal.

[11]    Vertebrae in a person's spine are given letter and number designations according to location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column (last visited Jan. 26, 2023). The 12 vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id*. The 5 in the lower spine—the lumbar spine—are L1 through L5. *Id*. And the 5 vertebrae at the bottom of the spine—in the sacrum—are labeled S1 through S5. https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region (last visited Jan. 26, 2023).

edema of the patella, "at least mild distal[12] quadriceps tendinosis,"[13] and "diffuse patellar tendinosis." Tr. 588. In Frierson's right knee, Dr. Rice observed a potential enchondroma[14] in the femur distal to the knee, though Dr. Rice recommended further testing and indicated that his observation could just be a bony lesion. Tr. 591–92. During this same time period, Frierson's psychiatrist Sybille Marqua, M.D., noted that Frierson had an abnormal gait and was walking on the tips of his toes. Tr. 554.

In December 2017, neurologist Alessandro Serra, M.D., became Frierson's primary provider of neurological care. Tr. 26, 566–68. Dr. Serra determined that Frierson's multiple sclerosis was relapsing-remitting[15] and

---

[12]    One part of the body is distal to another when it is farther away from the center of the body. *Distal*, National Cancer Institute, NCI's Dictionary of Cancer Terms, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/distal (last visited Feb. 21, 2023).

[13]    Quadriceps tendinitis is inflammation in the tendon that attaches the quadriceps muscle to the patella. *Causes and Treatments for Quadriceps Tendinitis*, Healthline, Health Conditions (last visited Mar. 2, 2023), https://www.healthline.com/health/quadriceps-tendonitis. The quadriceps tendon straightens the knee so we can walk, jump, and climb stairs. *Id*.
    Untreated tendonitis can lead to the more serious condition of tendonosis, or tendinosis, a chronic condition where the collagen in a tendon deteriorates. *Recognizing the Symptoms of Tendonosis*, Healthline, Health Conditions (Dec. 10, 2019) https://www.healthline.com/health/tendonosis. There is no inflammation in tendonosis; rather, the tissue is degrading. *Id*.

[14]    An enchondroma is a benign tumor in the cartilage at the center of a bone. *Enchondroma*, Cleveland Clinic Health Library, Diseases & Conditions, https://my.clevelandclinic.org/health/diseases/22113-enchondroma (last visited Feb. 21, 2023).

[15]    People with relapsing-remitting MS (RRMS) have flare-ups of new and worsening symptoms followed by periods of remission. *Multiple Sclerosis (MS)*,

noted that his fibromyalgia and narcolepsy were contributing to his symptoms. Tr. 568. Given Frierson's "depression, fatigue, and some cognitive issues," Dr. Serra opined that marijuana would not be helpful in Frierson's case. *Id*.

In April 2018, Frierson saw Dr. Serra. Tr. 674–76. Frierson reported that he occasionally felt a shooting pain down his spine, experienced headaches approximately three times a week that responded to medication, and had intermittent numbness in his fingers that was improving. Tr. 674. Frierson reported feeling generally weak but attributed the feeling to the fact that he was weaning off an antidepressant medication. *Id*. Dr. Serra found that Frierson was alert and oriented, followed simple and complex commands, and possessed a normal fund of knowledge. Tr. 675. He found that Frierson's soft-touch sensation was intact and equal throughout his body though Frierson's response to sharp stimuli demonstrated numbness in his right calf. *Id*. Dr. Serra noted full muscle strength in Frierson's arms, and that his muscle tone and bulk were normal, his facial muscles and nerves intact, his reflexes intact except in his Achilles, and his gait steady and intact. Tr. 675–76. Dr. Serra observed a "questionable new lesion"[16] in the most recent MRI of Frierson's brain and ordered a follow-up MRI in six months. Tr. 673–74, 676.

---

Cleveland Clinic Health Library, Diseases & Conditions (last visited Feb. 15, 2023), https://my.clevelandclinic.org/health/diseases/17248-multiple-sclerosis.

[16]    The Commissioner writes that Dr. Serra found no new or enhancing lesions in Frierson's brain in April 2018. Doc. 11, at 1 (citing Tr. 674). Frierson did not dispute this when he discussed the same appointment. *See* Doc. 9, at 4. Review, however, shows that Dr. Serra's note recording "no new or enhancing

7

In June 2018, Frierson visited a sleep clinic to address concerns of narcolepsy without cataplexy,[17] REM sleep behavior disorder,[18] vivid dreams, and fragmented sleep. Tr. 654.

In October 2018, Dr. Serra reviewed the results of Frierson's six-month follow-up MRI and found that there were no new or enhancing lesions. Tr. 889.

In mid-October 2018, Frierson saw Dr. Serra. Tr. 889. He complained of intermittent sharp pain on the right side of his back and buttock. *Id*. On examination, Dr. Serra determined that this pain was unrelated to multiple sclerosis and suggested that Frierson address it with his primary care physician. Tr. 891. Frierson reported that "[s]ometimes" his legs buckled but denied experiencing any fall, weakness, numbness, tingling, vision changes, or fatigue. *Id*. Dr. Serra found that Frierson's muscle bulk and tone were normal,

---

lesions" referred to his MRI from March 2017 not April 2018. *Compare* Tr. 674, *with* Tr. 676. Further, Dr. Serra documented his concern about a new, questionable lesion on the left side of Frierson's brain in April 2018 and ordered a follow-up MRI for six months. Tr. 676. That MRI was conducted in October 2018, six months after the April 2018 appointment. Tr. 891–892.

[17]     Narcolepsy is a chronic condition that disrupts a person's normal sleep pattern producing excessive drowsiness. Dr. Hayley Willacy, *Narcolepsy and Cataplexy* (*Causes, Symptoms, and Treatment*), Patient, Professional Articles, History and Examination (last visited Feb. 22, 2023), https://patient.info/ doctor/narcolepsy-and-cataplexy-pro. Narcolepsy may occur with or without cataplexy, which is the sudden loss of muscle tone and power in response to a strong emotion, though cataplexy always and only occurs as part of narcolepsy. *Id*.

[18]     An individual with rapid eye movement (REM) sleep behavior disorder physically acts out his or her dreams instead of experiencing the temporary paralysis of the arms and legs that is normal during REM sleep. *REM sleep behavior disorder*, Mayo Clinic, Patient Care & Health Information, Diseases & Conditions (last visited Feb. 22, 2023), https://www.mayoclinic.org/diseases-conditions/rem-sleep-behavior-disorder/ symptoms-causes/syc-20352920.

his overall strength was a "5" out of five, his sensation to light touch was normal, and his coordination was intact. Tr. 890. Dr. Serra described Frierson's multiple sclerosis as stable without progression. *Id*.

Days later, Frierson sent an email asking physician Joseph C. Orzechowski to order an MRI to investigate the source of the back and buttock pain. Tr. 888. Frierson clarified that the pain started in his tailbone and radiated to his hips. *Id*. In November 2018, radiologist Christina M. Wirtz reviewed x-rays that showed degenerative changes in Frierson's hips suggesting potential femoral acetabular impingement.[19] Tr. 801.

In November 2018, radiologist Guruprasad A. Srinath reviewed an MRI of Frierson's lumbar spine and observed a mild disc bulge between Frierson's L4 and L5 vertebrae. Tr. 803.

In December 2018, Frierson saw primary care physician Steven M. Takacs. Tr. 864. Frierson requested a replacement knee brace. *Id.* He mentioned that he had stiffness in the morning that lasted for about 30 minutes and returned if he didn't move throughout the day. *Id*. Dr. Takacs diagnosed Frierson with osteoarthritis in his pelvic region and hip, and noted that Frierson's multiple sclerosis was stable but could "certainly contribute" to

---

[19]     Femoroacetabular–or hip–impingement, is when the ball of the hip, the femoral head, pinches against the cup of the hip, the acetabulum. *Hip impingement*, Johns Hopkins Health, Conditions and Diseases (last visited Feb. 22, 2023), https://www. hopkinsmedicine.org/health/conditions-and-diseases/hip-impingement. This damages the cartilage surrounding the acetabulum causing stiffness, pain, and even arthritis in the hip. *Id*.

the fatigue symptoms he was experiencing. Tr. 866. Dr. Takacs recorded Frierson's diagnoses as fibromyalgia, lumbar spine degeneration, lumbar spondylosis,[20] primary osteoarthritis in his knees, and generalized anxiety disorder. Tr. 866. Dr. Takacs found Frierson alert, cooperative, pleasant, and comfortable during the appointment but described his affect as "[f]lat and sad." Tr. 865–66. He referred Frierson to physical therapy. Tr. 866.

In January 2019, Frierson arrived for his physical therapy appointment without the aid of any device. Tr. 852. He indicated that he had not noticed any improvement as a result of the therapy and felt that the exercises "somewhat exacerbate[d]" his symptoms, though he continued to do them anyway. *Id*. He expressed an interest in pursuing alternative pain management through aquatic therapy or medication. *Id*.

In April 2019, Frierson saw neurology clinical resident Kaitlyn Palmer, who was overseen by Dr. Serra. Tr. 828–32. Dr. Palmer noted that Frierson continued to tolerate his multiple sclerosis medication well and that his symptoms were stable. Tr. 828. Frierson complained of intermittent numbness in his left hand and occasional numbness in his left flank when he looked down. *Id*. He reported feeling stabbing sensation above his left eye that lasted several seconds and occurred two to three times "in a given day." *Id*. Dr. Palmer observed that Frierson was alert and oriented with normal facial sensation,

---

[20]     Spondylosis is "ankylosis of a vertebral joint." Dorland's Illustrated Medical Dictionary 1754 (32nd ed. 2012). Ankylosis is the immobility and consolidation of a joint due to disease, injury, or surgery. *Id*. at 94.

muscle movement, and articulation. Tr. 829–30. She conducted a pinprick test and found a diminished response in Frierson's fingertips. Tr. 830. Dr. Palmer observed that Frierson's muscle tone was normal, his overall strength was full, his reflexes and gait were normal, and he had coordination in his arms that was free of involuntary muscle movement. *Id.*

In June 2019, Frierson saw Dr. Serra. Tr. 820–22. Dr. Serra observed that Frierson was alert and oriented with normal facial sensation to light touch and pinprick, full muscle strength in his arms and legs, normal reflexes, and a normal gait. Tr. 821–22. Dr. Serra conducted a pinprick test and found a diminished response in Frierson's fingertips. Tr. 822. He prescribed a knee brace to replace one that Frierson had misplaced. *Id*. Frierson informed Dr. Serra that he was not interested in chronic pain treatment at that time and did not want a referral to a pain management clinic. *Id*.

Also in June 2019, Frierson saw physical therapist Christopher T. Wood. Tr. 1174–76. Wood observed that Frierson had a full range of motion and full strength in his arms and legs, normal grasp strength in his hands, and needed to shift regularly when he was standing. Tr. 1174–75. Wood found that Frierson could sit for 30 minutes without issue, and could stoop, partially squat, and use stairs "within normal limits." *Id.*

In January 2020, Frierson saw internist Natalie Demyan, M.D., complaining of pain in his knees. Tr. 1139. Dr. Demyan confirmed that Frierson had chronic knee pain and referred him to a physical therapist so that

he could be measured for braces. *Id*. Dr. Demyan noted that Frierson had a normal range of motion in his knees without swelling. *Id*. Dr. Demyan suggested x-rays but Frierson declined. *Id*. She referred him to a podiatrist. *Id*.

Shortly thereafter, Frierson met with physical therapist Danika Quinlan, who fit him for bilateral knee braces. Tr. 1030. Frierson said he had difficulty negotiating stairs and sitting with his knees bent. *Id*. Quinlan found that Frierson had a normal range of motion in his knees and no swelling. *Id*. She noted that he struggled to stand from a seated position. *Id*.

In July 2020, Dr. Malaty reviewed the most recent MRI of Frierson's brain and made observations consistent with multiple sclerosis. Tr. 963–64.

In December 2020, Frierson saw Dr. Serra. Tr. 1051–54. Dr. Serra found that Frierson was alert and oriented with normal facial sensation, normal muscle movement, full strength in his arms and legs, and an antalgic gait.[21] Tr. 1053. Dr. Serra reviewed the most recent MRI of Frierson's brain and found his multiple sclerosis stable without any new or enhancing lesions. Tr. 1052. Frierson complained of diffuse joint pain and reported that his legs "gave out" regularly as he walked, "especially while turning." *Id*. Frierson indicated that this was more pronounced on his right side. *Id*. Frierson described pain behind his knees so intense that he was "sometimes" unable to climb stairs and felt as

---

[21]    An antalgic gait is a disruption in a person's walking pattern that is usually caused by pain. *Antalgic Gait: Causes, Symptoms, and* Treatment, Healthline, Health Conditions (last visited Feb. 24, 2023), https://www.healthline.com/health/antalgic-gait.

if he might fall, though he was "usually" able to catch himself. *Id.* Frierson reported that he regularly took medical marijuana and described his pain as disabling. Tr. 1052, 1054. He indicated that he was ready to see a pain management specialist. Tr. 1054.

In January 2021, Frierson was examined at a pain management clinic by resident Anna K. Hayburn overseen by psychologist Lindsey LaVeck. Tr. 984–89. Frierson reported severe joint pain that was affecting his functioning and severe stiffness that was worse in the morning. Tr. 986, 988. He described pain that affected his mood and mobility as well as his ability to be physically active, accomplish household tasks, and participate in social relationships. Tr. 988–89. He informed Dr. Hayburn that his pain was exacerbated by temperature changes as well as activities, such as driving, during which he couldn't move for a period of time. Tr. 986. He rated his pain between a "5" and "7" out of ten. *Id.* Dr. Hayburn noted that Frierson had sought treatment from the pain management clinic in 2015 but hadn't been successful because he "refused pain psychology engagement" and never followed up with physical therapy. Tr. 988.

*Mental health impairment evidence.* In November 2017, Frierson saw Josie M. Bolanos, Psy.D., for psychotherapy. Tr. 568. Dr. Bolanos described Frierson's mood as anxious. Tr. 569. She found that Frierson was alert, cooperative and reasonable, with normal speech, no unusual thought content,

no hallucinations or suicidal ideation, intact language, normal and coherent thought process and association, and an intact memory. Tr. 569.

In mid-January 2018, Frierson had a psychiatry appointment with Dr. Marqua to address his "mood disorder due to a general health condition"[22] and generalized anxiety. Tr. 552–55. Dr. Marqua conducted a psychological evaluation and provided Frierson with education, medication management, and therapy. *Id*. When he asked about medical marijuana, Dr. Marqua "made it very clear" that neither she, the Veteran's Administration (VA), nor the federal guidelines supported the use of THC (the primary psychoactive compound in marijuana) for psychiatric conditions such as anxiety or mood disorder. Tr. 552, 554. Dr. Marqua noted that Frierson was reluctant to accept her explanations and described him as "paranoid" about the effects of FDA-approved medications. Tr. 553. Dr. Marqua found Frierson difficult to interview and recorded his "circumstantial way"[23] and his evasiveness when discussing his psychiatric symptoms. Tr. 552–53. Dr. Marqua observed that Frierson's eye contact was intermittent or limited and his speech spontaneous,

---

[22]    Mood disorder is a classification that medical professionals use to broadly describe all types of depression and bipolar disorders. *Mood disorders*, Johns Hopkins Health, Conditions and Diseases (last visited Feb. 24, 2023), https://www.hopkinsmedicine.org/health/conditions-and-diseases/mood-disorders. "Mood disorder due to a general medical condition" is one of the most common types of mood disorder. *Id*.

[23]    Circumstantiality is a disturbed pattern of speech or writing characterized by excessive indirectness that delays getting to the point due to the interpolation of unnecessary details and irrelevant parenthetical remarks. Dorland's Illustrated Medical Dictionary 364 (32nd ed. 2012).

fluent, and rambling with a monotonous rhythm. Tr. 554. Dr. Marqua noted that Frierson's attention and concentration were focused and that his insight and judgment were fair. *Id.* She described his affect as "appropriate," but "restricted [in] range," guarded, and suspicious. *Id.*

In late January 2018, Frierson saw Dr. Marqua and reported that he occasionally experienced hallucinations. Tr. 550. The next day, Frierson saw Dr. Bolanos for psychotherapy. Tr. 549. Dr. Bolanos found Frierson's mood euthymic[24] and described him as alert, cooperative, and reasonable, with normal speech, intact language, intact memory, and normal and coherent thought processes and association. *Id.* Frierson denied experiencing any hallucinations or suicidal ideation. *Id.*

In February and March 2018, when Frierson saw Dr. Bolanos for psychotherapy, she described his mood as dysphoric.[25] Tr. 691, 696.

In April 2018, Frierson saw Dr. Bolanos for psychotherapy. Tr. 663–64. She described his mood as dysphoric and found him to be alert, cooperative and

---

[24] Euthymia describes the state of living without mood disturbances. *Euthymia and Bipolar Disorder*, Healthline, https://www.healthline.com/health/euthymic (last visited Feb. 2, 2023). A euthymic person has a calm and steady mood, and typically experiences feelings of cheerfulness and tranquility with increased resilience to stress. *Id.*

[25] Dysphoria refers to a profound sense of unhappiness, distress, and indifference. Geralyn Dexter, LMHC, *Dysphoric Mood: Warning Signs and How to Cope*, Verywell Health, https://www.verywellhealth.com/dysphoric-mood-warning-signs-and-how-to-cope-5205365 (last visited Mar. 4, 2023). It is a symptom associated with various mental health conditions, including depression, bipolar disorder, and schizophrenia. *Id.*

reasonable with normal speech, intact language, normal and coherent thought processes and association, and an intact memory. Tr. 663–64, 763. Dr. Bolanos noted no unusual thought content. Tr. 763. Frierson denied having any hallucinations or suicidal ideation, but he did mention an increase in "night terrors or vivid dreams" while weaning off an antidepressant. Tr. 663.

In May 2018, Dr. Bolanos saw Frierson for psychotherapy. Tr. 660–61. She described Frierson's mood as dysphoric and noted that she found him to be alert, cooperative and reasonable with normal speech, intact language, normal and coherent thought processes and association, an intact memory, and without unusual thought content. Tr. 661. Frierson denied having any hallucinations or suicidal ideation. *Id.*

In late July 2018, Dr. Bolanos saw Frierson for psychotherapy. Tr. 913–14. Dr. Bolanos described Frierson's mood as euthymic and found him to be cooperative and reasonable. Tr. 914. She noted that his speech was normal, his thought process and association were normal and coherent, his thought content was not unusual, and his memory and language were intact. *Id.*

In December 2018, clinical psychologist Jamie L. Reed, Psy.D., became Frierson's primary provider of psychotherapeutic care.[26] Tr. 883, 1060–78. Frierson saw Dr. Reed every two to four weeks until January 2021. Tr. 824,

---

[26]    Throughout his brief, Frierson refers to treatment received from, and opinions provided by, "Dr. James Reed." Pl. Br. at 3, 12. However, Frierson's clinical psychologist is Jamie L. Reed, Psy.D. Tr. 825, 857, 922–23, 933, 116–17.

1047, 1060–62, 1066–68, 1077–78, 1080–85, 1088–91, 1108–14, 1116–17, 1129–31, 1143–47, 1152–54, 1160–62, 1176–78.

In April 2019, Dr. Reed described Frierson's mood as dysthymic[27] and anxious without indications of a thought disorder or psychosis. Tr. 824. Dr. Reed found Frierson's behavior polite, his affect congruent, his memory and intellect grossly intact, and his judgment and insight fair. *Id*.

In June 2019, Dr. Reed described Frierson's mood as dysthymic and anxious without indications of a thought disorder or psychosis. Tr. 933. Dr. Reed found Frierson's behavior to be polite, his affect congruent, his memory and intellect grossly intact, and his judgment and insight fair. *Id*. Frierson reported frustration in his interactions with others due to his perception of how they treated or viewed him. Tr. 931.

In March 2020, Dr. Reed described Frierson's mood as dysthymic and anxious without indications of a thought disorder or psychosis. Tr. 1116. Dr. Reed found Frierson's behavior polite, his affect congruent, his memory and intellect grossly intact, and his judgment and insight fair. *Id*.

In January 2021, pain management clinical resident Hayburn examined Frierson and found that he was "very perseverative[28] and noted that she had

---

[27]     Dysthymia is a mild but long-lasting form of depression also called persistent depressive disorder. *Dysthymia*, Johns Hopkins Health, Conditions and Diseases, https://www.hopkinsmedicine.org/health/conditions-and-diseases/dysthymia (last visited Feb. 24, 2023).

[28]     Perseveration is "the inappropriate persistence or repetition of a thought or act after the causative stimulus has ceased or in response to

difficulty redirecting him. Tr. 983–89. She remarked that Frierson's anxiety symptoms did not appear to be well-controlled. Tr. 989.

*State agency[29] and other opinion evidence of physical health.* In April 2018, state agency physician Gerald Klyop, M.D., reviewed the medical evidence and determined that Frierson was capable of work with a light level of exertion. Tr. 112–14. Dr. Klyop limited Frierson to lifting, carrying, or pulling 20 pounds occasionally and 10 pounds frequently. Tr. 112. He opined that Frierson could stand, walk, or sit for a maximum of six hours in an eight-hour workday. Tr. 113. Dr. Klyop restricted Frierson from climbing ladders, ropes, or scaffolds, but found that Frierson could frequently balance and occasionally climb ramps or stairs. *Id*. Dr. Klyop found that Frierson retained the capacity to stoop, kneel, crouch, or crawl. *Id*. He placed no environmental limitations on Frierson except he must avoid all exposure to hazards such as heights, hazardous machinery, and commercial driving. Tr. 114.

---

different stimuli, e.g., answering a question correctly and then inappropriately repeating that answer to succeeding questions." Dorland's Illustrated Medical Dictionary 1421 (32nd ed. 2012).

[29] When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

In August 2018, during reconsideration, state agency physician Steve McKee, M.D., affirmed Dr. Klyop's findings. Tr. 129–31.

In June 2019, Dr. Serra completed a Physical Medical Source Statement in which he opined that, in an eight-hour workday, Frierson could walk five city blocks, sit for an hour at a time, stand for an hour at a time, stand or walk for two hours total, and sit for four hours total. Tr. 918–19. He said that Frierson needed a job that would allow him to shift positions at will between sitting, standing, and walking. Tr. 919. Dr. Serra opined that Frierson needed to walk for ten minutes every hour during the workday and required up to two 10-minute unscheduled breaks throughout the day. Tr. 919. Dr. Serra found that Frierson could lift or carry 10 pounds occasionally and 20 pounds rarely, and that he could never lift or carry 50 pounds. Tr. 920. Dr. Serra found that Frierson could occasionally climb stairs with a handrail, rarely stoop or bend, and never twist, crouch, squat, or climb a ladder. *Id*. He placed no manipulation limits on Frierson's hands, fingers, or arms. *Id*.

In late June 2019, physical therapist Wood and internist Renee Lambert, M.D., conducted an evaluation of Frierson's physical functional capacity that was reviewed and co-signed by Dr. Demyan. Tr. 927–931. Wood and Dr. Lambert noted that Frierson tested into a "sedentary-based work category"[30] and "would require restrictions with prolonged sitting and standing." Tr. 931.

---

[30]     The physician's notes do not define "sedentary-based work."

*State agency and other opinion evidence of mental health.* In December 2016, Walter Knake, Ph.D., wrote a letter to the Department of Veterans Affairs in support of an application Frierson submitted seeking a determination of unemployability. Tr. 524–28. Dr. Knake based his letter on two interviews he conducted with Frierson in October 2016.[31] *Id.* In September 2017, Dr. Knake interviewed Frierson for an hour and submitted an updated letter to the Department of Veteran's Affairs incorporating the third interview. Tr. 522–23. During the Social Security Administration (SSA)'s initial assessment of Frierson's disability claim, SSA solicited Dr. Knake's records and an overview of his treatment and assessment of Frierson in the form of a questionnaire. Tr. 529–31. Dr. Knake submitted the questionnaire, including his opinion as to Frierson's ability to tolerate stress. *Id.*

In March 2018, state agency psychologist Patricia Kirwin, Ph.D., reviewed the medical evidence and determined that Frierson had no limitations in his ability to understand, remember, or apply information. Tr. 114–16. Dr. Kirwin opined that Frierson was moderately limited in his interacting with others, in concentrating, persisting, or maintaining pace, and in adapting or managing himself. *Id.* Dr. Kirwin found that Frierson could maintain consistent attention and concentration for tasks that required up to four steps and occasionally capable of maintaining attention and concentration

---

[31]    In his brief, Frierson cites Dr. Knake's letter "dated September 22, 2017," then directs the reader to a portion of the record that contains a different letter from Dr. Knake. Doc. 9, at 3 (citing Tr. 524–528).

for tasks requiring five or six steps, with no high-pace or high-production quotas. Tr. 115. Dr. Kirwin noted that Frierson may require a varied break schedule when his symptoms are intense; found that he was capable of brief and superficial interactions with the general public, supervisors, and coworkers; and opined that he would do best in a worksite where he could work relatively independently and without close "over-the-shoulder supervision." Tr. 115–16. Dr. Kirwin found that Frierson retained the ability to complete tasks in an environment where changes were occasional and explained in advance. Tr. 116.

In August 2018, upon reconsideration, state agency psychologist Paul Tangeman, Ph.D., affirmed Dr. Kirwin's findings. Tr. 131–33.

In June 2019, Dr. Reed completed a Mental Impairment Questionnaire and listed Frierson's diagnosis as generalized anxiety disorder.[32] Tr. 922. The questionnaire asked Dr. Reed to categorize Frierson's ability to complete various work-related activities. Tr. 922–923. Dr. Reed declined to classify any as "unlimited or very good" or "limited but satisfactory." Tr. 922–23.

Dr. Reed found Frierson seriously limited in, but not precluded from, the ability to: (1) carry out very short and simple instructions; (2) carry out detailed

---

[32]     In providing the "facts" purportedly gleaned from Dr. Reed's questionnaire, Frierson asserts, "Dr. Reed diagnosed Frierson with generalized anxiety disorder and had difficulty with mood swings, stress tolerance, focus, concentration, and fatigue," and that, "as a result" Dr. Reed assessed Frierson accordingly. Doc. 9, at 12–13. Frierson does not cite the record when he lists these diagnoses, none of which are found in Dr. Reed's questionnaire. Tr. 922–23. As such, I am using Dr. Reed's diagnosis as written.

instructions; (3) manage regular attendance and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) remember locations and work-like procedures; (6) understand and remember very short and simple instructions; (7) understand and remember detailed instructions; (8) ask simple questions or request assistance; (9) be aware of normal hazards and take appropriate precautions; and (10) set realistic goals or make plans independently of others. *Id.*

Dr. Reed opined that Frierson was unable to meet competitive standards in his ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically-based symptoms; (5) interact appropriately with the general public; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (7) maintain socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and (8) respond appropriately to changes in the work setting. *Id.*

Dr. Reed found that Frierson had no useful ability to perform at a consistent pace without an unreasonable number and length of rest periods, or to accept instructions and respond appropriately to supervisory criticism. *Id.* Dr. Reed found that Frierson's impairments or treatment would require him to be absent from work three to five days per week. *Id.* Dr. Reed wrote, "I don't

know," when the questionnaire asked for the anticipated percentage of each workday that Frierson would need to spend off-task. *Id.*

*Testimonial evidence.* During the initial hearing in July 2019, Frierson was represented by counsel. Tr. 48–72. Frierson discussed his past work then his multiple sclerosis-based limitations. Tr. 54–57. Hot weather and humidity worsened his symptoms and made him feel as if he was "walking around with weights on," while cold weather implicated his Raynaud's syndrome.[33] Tr. 54–55. Fatigue made everything harder for Frierson to accomplish. *Id.* Two different types of knee braces helped him to walk, though they caused pain if he kept them on or if he remained in one position for too long. Tr. 55–56. He had joint pain which worsened if he moved too much or not enough. Tr. 57.

Frierson and vocational expert George Coleman testified during the hearing on remand in March 2021. Tr. 73–103. Frierson was represented by attorney Michael Liner. Tr. 73. The ALJ initially asked Frierson to discuss changes to his physical health since the last hearing. Tr. 76–78. Frierson testified that with his wife's encouragement, he started using a cane to walk, even though he finds it embarrassing. Tr. 76, 101. The cane is not medically prescribed. Tr. 101. His wife bought it for him because she knows that "his

---

[33]     Raynaud's disease or syndrome is the narrowing of smaller arteries that supply blood to the skin in response to cold temperatures or stress, causing the affected area—typically fingers or toes—to feel cold or numb. *Raynaud's disease*, Mayo Clinic, Patient Care & Health Information, Diseases & Conditions, https://www.mayoclinic.org/diseases-conditions/raynauds-disease /symptoms-causes/syc-20363571 (last visited Feb. 28, 2023). Upon warming or stress relief, the area may feel numb, prickly, or develop a stinging pain. *Id.*

23

knees give out" "a lot of times" "when he walks." Tr. 76. Frierson had to reschedule aquatic therapy because he got sick, but expected to start attending in May 2021. Tr. 77. He has arthritis in his hips and in his knees. Tr. 78. There are times that his toes hurt too, but he can't just "sit around" because he is responsible for his 81-year-old mother. *Id.*

Frierson discussed his physical pain. Tr. 79–82. He has pain throughout his body in all of his joints that move. Tr. 79. It is a stabbing pain that feels like "cartilage" or "like [his bones] are grinding." *Id.* He isn't sure why, but some days the pain is manageable and other days it's aggravated. *Id.* On a scale of 1 to 10 with 10 being the worst, his pain is at a level 5 on a normal day. Tr. 80. It is an 8 on a bad day. *Id.* Frierson can drive without any issue but limits the time he spends behind the wheel to 20 minutes or less. Tr. 81. Immobility makes his body stiffen as if it is "molded," so when he spends too long in a seated, driving position, it is very challenging for him to get out of the car. Tr. 80–81. Medical marijuana is the only treatment that alleviates his pain and allows his body to heal and recover. Tr. 81.

Frierson discussed his multiple sclerosis and fibromyalgia. Tr. 83–84. It is hard for him to differentiate between the symptoms of multiple sclerosis and the symptoms of fibromyalgia, though he knows that his sense of touch, taste, and balance are affected by the multiple sclerosis. Tr. 83–84. When he walks, multiple sclerosis and fibromyalgia make it feel as if he is walking

24

through deep snow. *Id*. When he is sitting down, multiple sclerosis and fibromyalgia make it difficult for him to stand up. Tr. 84.

Frierson discussed his narcolepsy. Tr. 85–86. Narcolepsy causes Frierson daytime sleepiness and fatigue. Tr. 85. The combination of vivid dreams and drowsy days also interferes with his sense of reality. Tr. 86.

Frierson discussed his mental health. Tr. 86–88. He is a loner who does not like working with others. Tr. 86. He struggles daily with paranoia and trust issues, and dwells on things that have happened to him. Tr. 87. His anger "eats him up" and "breaks [him] down from the frustration." Tr. 87–88. He has engaged in physical altercations "at times" with people at work and "gotten into it verbally a lot." Tr. 87–88.

The ALJ finished his questioning by asking Frierson whether he wanted to discuss any additional medical impairments that hadn't been addressed. Tr. 88. Frierson mentioned Raynaud's syndrome, which makes him very sensitive to cold temperatures. *Id*. He loses circulation easily, especially in weather under 50 degrees; this recently prohibited him from staying in a grocery store long enough to finish his shopping. Tr. 88–89.

Then the ALJ notified Frierson's attorney Michael Liner that he would have five minutes to elicit additional direct testimony. Tr. 90. The attorney said, "Okay, I'm sorry. I guess that's good enough. I mean I guess we can kind of get to the point." Tr. 90. Attorney Liner asked Frierson to discuss his household duties. Tr. 91. Frierson said that he cooks twice a week, helps with

25

the dishes, and depending on the day, vacuums, sweeps, and mops. Tr. 91–92. Then the ALJ notified the attorney that there were two minutes left. Tr. 91. Attorney Liner asked Frierson whether he had difficulty showering or changing his clothes; Frierson affirmed that he did. Tr. 92. The ALJ concluded Frierson's testimony and called vocational expert George Coleman to testify. Tr. 92. Attorney Liner objected, insisting that he wasn't finished questioning Frierson. *Id*. In response, the ALJ said that Frierson had testified in an unfocused and meandering manner for 45 minutes. *Id*. The ALJ later said that the testimony showed that Frierson had, "no difficulty whatsoever putting any of his thoughts into words." Tr. 99. The ALJ informed the attorney that the hearing would proceed with Mr. Coleman's testimony and acknowledged that this was over Attorney Liner's objection. *Id*.

The ALJ and Mr. Coleman discussed Frierson's past work as a security guard, warehouse laborer, and food service or cafeteria worker. Tr. 93. Mr. Coleman classified Frierson's security guard job as semi-skilled work that required a light level of exertion and his warehouse laborer and food service or cafeteria jobs as unskilled work that required medium exertion. Tr. 94, 95. Mr. Coleman said that a hypothetical individual with the same age, education, and work experience as Frierson would not be able to perform Frierson's past work as actually or generally performed if that hypothetical individual had the limitations assessed in Frierson's RFC, described below. Tr. 93–95. Mr. Coleman said, however, that within Frierson's RFC, such an

26

individual could perform unskilled work that required light level of exertion such as an office helper or cafeteria attendant, as well as sedentary, unskilled work such as an address clerk or document preparer. Tr. 94–95.

The ALJ asked Mr. Coleman whether jobs would exist for such an individual if the individual was off task for 20 percent of the workday on an ongoing basis. Tr. 96. Mr. Coleman indicated that this exceeded the amount of off-task time that was acceptable to most employers, so it would preclude such an individual from all work. *Id.* Attorney Liner asked Mr. Coleman whether the employer or the individual in these types of jobs was responsible for scheduling breaks and Mr. Coleman answered that it was the employer. Tr. 96. Mr. Coleman testified that if the hypothetical individual needed a varied break schedule, he or she would need to seek an accommodated work environment or alternative work schedule. *Id.* Attorney Liner asked Mr. Coleman whether jobs would exist for the original hypothetical individual if he or she was absent an average of three or more days each month on an ongoing basis. Tr. 96. Mr. Coleman indicated that this exceeded the amount of absenteeism that was tolerated by most employers, so it would preclude such an individual from all work. Tr. 97.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

1.     Frierson meets the insured status requirements of the Social Security Act through December 31, 2022.

2.     Frierson has not engaged in substantial gainful activity since July 6, 2017, the alleged onset date. 20 CFR § 404.1571 *et seq*.

3.     Frierson has the following severe impairments: anxiety disorder with post-traumatic stress, fibromyalgia, stable multiple sclerosis, history of narcolepsy without cataplexy, generalized fatigue, and mild arthritic changes of the hips, knees, and spine. 20 CFR § 404.1520(c).

4.     Frierson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Section 404, Subpart P, Appendix 1. 20 CFR § 404.1520(d), 404.1525 and 404.1526.

5.     Frierson has the residual functional capacity, 20 CFR 404.1545, to perform light work as defined in 20 CFR 404.1567(b), except for no climbing of ladders, ropes or scaffolds; frequent balancing; occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling; no concentrated exposure to temperature extremes, vibration, or high background noise, as in a factory setting; no exposure to hazards—heights, machinery, commercial driving; and mental limitation that he perform routine tasks in a low stress environment—no fast pace, strict quotas, or frequent duty changes—involving superficial interpersonal interactions with coworkers, supervisors, and public—no arbitration, negotiation, or confrontation. 20 CFR 404.1569a.

6.     Frierson is unable to perform any past relevant work. 20 CFR 404.1565.

7.     Frierson was born on January 30, 1971 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Frierson subsequently changed age category to closely approaching advanced age upon his attainment of age 55 on January 29, 2021. 20 CFR 404.1563.

8.     Frierson has at least a high school education. 20 CFR 404.1564.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Frierson is "not

disabled," whether or not Frierson has transferable job skills. *See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2.

10. In consideration of Frierson's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Frierson can perform. 20 CFR 404.1569 and 404.1569(a).

11. Frierson has not been under a disability, as defined in the Social Security Act, from July 6, 2017, through the date of this decision. 20 CFR 404.1520(g).

Tr. 17–36.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## Discussion

*Frierson's first issue*

At first, it appears that Frierson's first issue concerns the ALJ's assessment of his treating physicians' opinions and the ALJ's failure "to incorporate the stated limitations in the RFC" assessment. Doc. 9, at 11. That's how Frierson captions his first argument. And the concluding paragraph to his first argument also references Frierson's "treating sources." *Id.* at 18. But in between the caption and last paragraph, he mentions a good deal of evidence and opinions that don't come from his treating physicians. Doc. 9, at 13–18. So,

despite the caption to his argument, Frierson seems to hint that he is also challenging the ALJ's assessment of all the medical evidence.

Unfortunately, in addition to obscuring his argument, Frierson also leaves the analysis to the Court. As noted, Frierson lays out pages of facts about the opinions of various medical professionals and about his medical evidence, *id*. at 12–18, before asserting a series of conclusions,[34] *id*. at 18. From these conclusions, Frierson says that "contrary to ALJ's erroneous conclusion, these opinions were supported by and consistent with the medical records in this matter." *Id*. He adds that (1) "the ALJ failed to address the contrary evidence," (2) the record doesn't "support the ALJ's erroneous conclusion that these opinions were not supported by the evidence in this matter," and (3) in finding the treating physicians' opinions unpersuasive, the ALJ "failed to give a coherent explanation for his reasoning as his rationale failed to view the entire record."[35] *Id*. Absent from all of this is any reasoned explanation for why Frierson thinks his factual recitation leads to his conclusions.

---

[34]    Frierson buries one unsupported, argumentative assertion in the middle of his factual regurgitation, that contrary to the ALJ's allegedly "erroneous conclusions," Frierson's treating physicians' "opinions were supported by and consistent with the VA medical records." Doc. 9, at 15.

[35]    Frierson also says that the "ALJ offered an inadequate analysis as required by" *Russ v. Comm'r of Soc. Sec.*, No. 1:20-CV-1838, 2021 WL 3709916 (N.D. Ohio Aug. 20, 2021), and "failed to proffer a coherent explanation as required by" *Lester v. Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at *10 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, No. 5:20CV1364, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). Doc. 9, at 18. Neither *Russ* nor *Saul* is binding in this matter, however. So although they may provide persuasive authority, they cannot be said to

This won't do. Frierson is represented by counsel. Determining a party's argument should not be a guessing game. It is not the Court's job to provide counsel's analysis. Here, Frierson's conclusions are not tied to any specific physician and he does not take on what the ALJ said. Instead, he presents his case as if the substantial evidence test merely requires him to show that the record supports *his* argument when, instead, it requires him to show that the ALJ's decision is not supported by substantial evidence. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Moreover, listing pages of facts and a series of conclusions is not persuasive. Nor is it appropriate to leave the analysis to the Court. *See Cason v. Colvin*, No. CV 15-12661, 2016 WL 6653019, at *3 (E.D. Mich. Aug. 9, 2016) ("rely[ing] upon Court staff to thoroughly review the record and perform the appropriate legal analysis … is unacceptable"), *report and recommendation adopted in part sub nom. Cason v. Comm'r of Soc. Sec.*, No. 15-12661, 2016 WL 4546872 (E.D. Mich. Sept. 1, 2016).

Nonetheless, even reviewing the ALJ's consideration of Frierson's treating physicians' opinions—assuming that is what Frierson's argument is about—Frierson's argument fails. Social Security regulations define the factors that an ALJ will consider when evaluating medical opinions. *See* 20 C.F.R. § 404.1520c(c). These factors include supportability, consistency, relationship to the claimant, specialization, and "other factors," including

---

require anything in this matter. And, in an event, Frierson doesn't explain what is inadequate or incoherent about the ALJ's analysis.

"familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."[36] *Id.*

Frierson first references neurologist Dr. Serra. Doc. 9, at 12. The ALJ reviewed Dr. Serra's evidence but found it unpersuasive. Tr. 31. First, Dr. Serra's treatment notes, which the ALJ cited, "confirm[ed]" that Frierson's "MS is stable with use of medication." *Id.* So Dr. Serra's opinion was "inadequately supported." *Id.* Second, although Dr. Serra's examination findings reflected "decreased sensation, abnormal reflexes, and a recently antalgic gait," they also reflected "normal alertness and orientation, no aphasia or dysarthria, normal facial sensation, full strength, intact proprioception, intact coordination, and consistently independent ambulation." *Id.* The latter findings rendered the former findings "inadequately supported." *Id.* Third, Dr. Serra's opinion was "inconsistent with" other evidence, "including examination findings of occasionally decreased lower extremity strength, abnormal reflexes and sensation, and a recently antalgic gait, but consistently normal range of motion, full upper extremity strength, intact coordination and balance, and consistently independent ambulation." *Id.* Fourth, the opinion was "also inconsistent with" Frierson's "rather extensive, intact activities of daily living, which include caring for his personal hygiene, caring for a pet dog, cooking full

---

[36]     Frierson says that the Court should focus on "[l]ength of the treatment relationship and the frequency of examination" and the "[n]ature and extent of the treatment relationship." Doc. 9, at 11. These are sub-factors under the "[r]elationship with the claimant" factor. 20 C.F.R. § 404.1520c(c)(3).

meals, performing household chores and yardwork, shopping in stores, attending church, visiting with his mother twice a week, doing crafts, reading, and listening to religious podcasts." *Id.* (citing Exhibits 12E and 14F/51 and Frierson's testimony).

So the ALJ determined that Dr. Serra's opinion didn't pass muster as to supportability and consistency. Then, as he was permitted to do, he noted that Dr. Serra's opinion was inconsistent with Frierson's activities of daily living. *See O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 417 (6th Cir. 2020). To the extent that Frierson mounts any argument as to Dr. Serra, his argument amounts to an invitation to consider the evidence *de novo* and to ignore the substantial evidence test. I decline that invitation. *See Key*, 109 F.3d at 273; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) ("This Court may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").

Frierson next focuses on the ALJ's assessment of the opinion from Dr. Reed, Frierson's psychologist. Doc. 9, at 12. The ALJ dedicated a lengthy discussion to his review of Dr. Reed's opinions and observations, noting that "Dr. Reed opined [that Frierson] would be absent from work three to five days per week." Tr. 32. The ALJ found Dr. Reed's opinion unpersuasive, as a global matter, because it was "rendered on a check-the-box form." *Id.*; *see* Tr. 922–23. In this regard, the Sixth Circuit in *Kepke v. Commissioner of Social Security* explained that although "checklist opinions are not *per se* unreliable" in social

security cases, an ALJ can consider an opinion's checklist "format" and whether the opinion "'fail[s] to provide any explanation for [the doctor's] responses.'" 636 F. App'x 625, 630 (6th Cir. 2016) (quoting *Price v. Comm'r of Soc. Sec.*, 342 F. App'x. 172, 176 (6th Cir. 2009)). Given the checklist nature of Dr. Reed's opinion and its lack of any explanation, the ALJ was on a sure footing in discounting the opinion. *See Cohen v. Sec'y of Dep't Health & Hum. Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.").

But the ALJ outlined three other reasons that he found Dr. Reed's opinion unpersuasive. Tr. 32–33. First, because it "contain[ed] little narrative discussion of [Frierson's] diagnoses, symptoms, and clinical findings to support the extreme limitations contained" in it, the ALJ held that it was "inadequately supported." *Id*. Second, the mental-status findings included in the opinion[37] were "inconsistent with the remaining evidence of record," which showed:

> normal alertness and orientation, appropriate, reasonable behavior, adequate hygiene and grooming, otherwise normal, fluent, spontaneous speech, normal language, normal thought content and associations, focused attention/ concentration, intact memory and intellect, and average fund of knowledge.

---

[37]     Those findings were "depressed, dysphoric, anxious mood, restricted, congruent, guarded, suspicious affect, occasionally interruptive speech with fast rate, circumstantial, perseverative thought processes, occasional word finding ability, and only fair insight and judgment." Tr. 32.

Tr. 32–33 (citing Exhibit 5F, 6F, 9F, 12F, 13F, 14F). Finally, Dr. Reed's "extremely restrictive opinion" about Frierson's abilities was not consistent with Frierson's:

> rather extensive, intact activities of daily living, which include caring for his personal hygiene, caring for a pet dog, cooking full meals, performing household chores and yardwork, shopping in stores, attending church, visiting with his mother twice a week, doing crafts, reading, and listening to religious podcasts.

Tr. 33 (citing Exhibit 12E, 14F/51, and Frierson's testimony).

Why Frierson believes that substantial evidence does not support the ALJ's assessment of Dr. Reed's opinion is unclear. He doesn't contest the ALJ's global concern about the checklist nature of the opinion and its omission of any explanation. And ALJs can rely on discrepancies between an opinion and evidence of a claimant's activities of daily living. *O'Brien*, 819 F. App'x at 417. ALJs can also rely on inconsistencies between an opinion and other evidence. 20 C.F.R. § 404.1520c(c)(2). Given that the record supports the ALJ's concerns, it is not possible to conclude that substantial evidence does not support the ALJ's determination as to Dr. Reed's opinion.

Frierson mentions the ALJ's assessment of the series of opinions offered by Dr. Knake. Doc. 9, at 13–14; *see* Tr. 521–31. Dr. Knake offered his opinions in the context of Frierson's application with the Department of Veterans Affairs for a rating of total disability based on individual unemployability. Tr. 522; *see Smith v. Shinseki*, 647 F.3d 1380, 1382 (Fed. Cir. 2011) (discussing total disability ratings based on individual unemployability); 38 C.F.R. § 4.16.

As of March 2017, ALJs are no longer required to "provide any analysis … about a decision made by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits." 20 C.F.R. § 404.1504. Instead, an ALJ must "consider all of the supporting evidence underlying the other … decision."[38] *Id.*

Dr. Knake interviewed Frierson at the request of Frierson's attorney in connection with Frierson's Veterans Affairs application. Tr. 524. In forming an opinion, Dr. Knake relied on three interviews of Frierson conducted in 2016 and 2017, Tr. 522–525, review of Frierson's Veterans Affairs medical records, Tr. 525, and Frierson's report of symptoms, Tr. 526.

It is especially difficult to know what Frierson thinks is deficient about the ALJ's assessment of Dr. Knake's opinion. Frierson doesn't contest the ALJ's finding that Dr. Knake was not one of Frierson's treating physicians. But Frierson's argument seemingly focuses on his treating physicians. And beyond Frierson's general complaint that "the ALJ failed to address the contrary evidence establishing support and consistency as detailed [at an unspecified

---

[38] Previously, another agency's disability determination would not have been binding on an ALJ but would have "constitute[d] relevant evidence" that "should be considered as part of the medical records presented by a claimant." *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 530 (6th Cir. 2014).

point] above," Frierson doesn't specifically say what he thinks is wrong with the ALJ's analysis.[39]

Turning to the ALJ's decision, the ALJ noted that Dr. Knake opined that it was "very difficult for [Frierson] to tolerate stress at any level." Tr. 33; *see* Tr. 531. The ALJ noted that Dr. Knake supported his opinion by noting that Frierson had "PTSD, anxiety, depression, and social isolation, with alleged poor concentration, memory, frustration tolerance, and social interactions, impatience, and" was "highly reactive emotionality." Tr. 33; *see* Tr. 530.

The ALJ first discounted Dr. Knake's opinion as "[in]adequately supported," because "Dr. Knake was not providing treatment to [Frierson] at the time" he "rendered" his opinion. Tr. 33. As noted, Frierson does not take issue with the ALJ's premise or the conclusion. So he's forfeited any argument that Dr. Knake's status relative to Frierson is not a valid basis to discount his opinion.

The ALJ also found Dr. Knake's opinion inadequately supported because it was inconsistent with other record evidence. Tr. 33. According to the ALJ, the record reflects that, in addition to a "depressed and anxious mood," Frierson had a "guarded affect, and fair insight and judgment, with cooperative

---

[39]     Frierson asserts that "the ALJ in this matter found that the statements of the treating sources were not persuasive and failed to give a coherent explanation for his reasoning as his rationale failed to view the entire record." Doc. 9, at 18. Frierson doesn't claim that Dr. Knake was a treating source, so Frierson's assertion doesn't apply to the ALJ's assessment of Dr. Knake's opinion.

and reasonable behavior, adequate hygiene and grooming, intact attention, concentration, and memory, normal thought content and perceptions, and no suicidal or homicidal ideation." Tr. 33 (citing Exs. 5F, 6F, 9F, 12F, 13F, 14F). And Frierson does not dispute that an ALJ is entitled to discount a physician's opinion if the opinion is "'inconsistent with other substantial evidence in the … record.'" *Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 475 (6th Cir. 2008) (discussing a treating physician's opinion) (citation omitted); *see Counts v. Comm'r of Soc. Sec.*, No. 22-3271, 2022 WL 17853572, at *2 (6th Cir. Dec. 22, 2022) (noting that even in the case of treating physician, an ALJ may discount an opinion if the "opinion is inconsistent with other substantial evidence in the record"). So, to the extent that Frierson challenges the ALJ's assessment of Dr. Knake's opinion, his challenge amounts to an inappropriate "invitation[] to reweigh the evidence." *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at *2 (6th Cir. Dec. 1, 2022).

The remainder of Frierson's argument merits little discussion. He notes his Veterans Affairs evidence, Doc. 9, at 14–18, but ALJs are only required to consider the evidence supporting another agency's disability determination. 20 C.F.R. § 404.1504. The ALJ in this case did that.[40] Tr. 26–27, 29. Frierson says that his Veterans Affairs records "were consistent with the opinions that

---

[40]     As noted, ALJs are not required to "provide any analysis … about a decision made by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits." 20 C.F.R. § 404.1504.

Frierson had problems which precluded him from being able to engage in substantial gainful activity during a normal workday." Doc. 9, at 18. Perhaps so, but the question on review is whether substantial evidence does not support the agency's decision. And showing that substantial evidence supports a claimant's argument doesn't show that substantial evidence does not support the agency's decision. *See Key*, 109 F.3d at 273.

Finally, Frierson notes that a physical therapist and internist signed off on his functional capacity evaluation and says that "[t]he Sixth Circuit has held that when [a functional capacity evaluation] is signed by a physician, it should be considered an opinion from a treating source." Doc. 9, at 15 (citing *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546 (6th Cir. 2020)). But that's not what the Sixth Circuit said. Instead, it said that because "Hargett's treating physician … signed off on the results of" his functional capacity evaluation, any functional capacity evaluation "that Hargett obtained upon referral by [that physician], … should have [been] considered … as a treating-source opinion." 964 F.3d at 553. Here, Frierson does not assert his referenced functional capacity evaluation was signed-off on by his treating physician. So *Hargett* doesn't apply.

Frierson's first argument is meritless.

*Frierson's second issue*

Frierson's second issue is a kitchen-sink argument. He throws out several phrases, with little analysis, in an apparent hope that something will stick. Indeed, he faults the ALJ but provides little analysis to support his argument.

Frierson captions his second argument as though it is about the ALJ's failure to appreciate the "waxing and waning" of his symptoms. Doc. 9, at 18. But Frierson only mentions this issue later in a single paragraph that is devoid of explanation or analysis. So he's forfeited this issue. *Sharpe v. Comm'r of Soc. Sec.*, No. 1:20 CV 2732, 2022 WL 2127960, at *4 (N.D. Ohio June 14, 2022) (citing *Bard v. Brown Cty.*, 970 F.3d 738, 750 (6th Cir. 2020)).

Frierson says that "the ALJ failed to account for disabling pain related to his impairments and symptoms which would interfere with Frierson's ability to sustain work activity." Doc. 9, at 20. This is inaccurate. The ALJ noted Frierson's reported pain, Tr. 18–19, and acknowledged the "two-step process" involved in determining whether "an underlying medically determinable … impairment(s) … could reasonably be expected to produce the claimant's pain or other symptoms." Tr. 22; *see* Doc. 9, at 20. The ALJ then engaged in that process before concluding that although Frierson's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence

and other evidence in the record for the reasons" the ALJ explained elsewhere in his decision. Tr. 23.

From there and with one exception, Frierson offers a litany of stream-of-consciousness complaints that jump from sentence to sentence with little or no explanation, analysis, or support in the record. Frierson claims that the ALJ didn't "articulate any supportable rationale for his finding that Frierson's statements were not entirely consistent with the medical evidence." Doc. 9, at 21. But the ALJ explained, at length, why the medical evidence didn't "corroborate [Frierson's] allegations." Tr. 24–28. Next, the ALJ noted that Frierson's "allegations of totally debilitating impairment" were belied by his "largely intact activities of daily living."[41] Tr. 28–29. Finally, the ALJ reviewed the course of Frierson's treatment and remarked on the comparison between Frierson's complaints and his "limited, conservative treatment record." Tr. 29.

Frierson also invites the Court to re-weigh the evidence, saying that "[t]he evidence, as set forth throughout [his] Brief, supported the fact that Frierson had pain issues exacerbated by" his conditions. Doc. 9, at 20–21. But the Court can't re-weigh the evidence and won't supply the missing analysis necessary to reach Frierson's unsupported conclusion.

---

[41]     "[A]n ALJ may consider household and social activities in evaluating complaints of disabling pain." *O'Brien*, 819 F. App'x at 417 (quoting *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (per curiam)).

Frierson then moves directly to making unsupported assertions without any attempt to provide analysis. He asserts:

- "the ALJ failed to articulate any supportable rationale for his finding that Frierson's statements were not entirely consistent with the medical evidence"

- "There was an insufficient analysis, and contrary to his boilerplate language, the ALJ did not comply with the requirements of SSR 16-3p."[42]

- "the decision in this case failed to contain specific reasons for the finding on credibility, was not supported by the evidence in the case record and was not sufficiently specific to make clear to the individual and to any subsequent reviews the weight the ALJ gave to Frierson and/or the remainder of the evidence in this matter."[43]

- "Likewise in this matter, the ALJ failed to take into account the records as set forth above which reflected Frierson's difficulties when he was experiencing increased fatigue and pain. Failing to account for the variability in Frierson's symptoms was harmful error in this matter necessitating a remand."

- "In this case, the ALJ did not build an accurate and logical bridge between the evidence documenting Frierson's disabling problems as set forth in the record, and the ALJ's decision that he could engage in substantial gainful activity on a sustained basis."[44]

---

[42] Frierson mentions Social Security Ruling 16-3p, Doc. 9, at 21, which concerns the "two-step process for evaluating an individual's symptoms." *See* Soc. Sec. Ruling 16-3p: Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P (SSA Mar. 16, 2016). Contrary to Frierson's unsupported claims, the ALJ acknowledged and applied this framework. *See* Tr. 22–23.

[43] This series of assertions is supported by a citation that instructs the reader to "See *Rogers*," Doc. 9, at 21, as if the entire *Rogers* decision shows that the ALJ in this case erred in the multiple ways described in the sentence preceding the citation.

[44] These latter two assertions might be described as throw-away arguments. Frierson's counsel includes them in many briefs that she files. *See*

Doc. 9, at 21, 23. None of these assertions are supported by any effort at developed argumentation. They are therefore forfeited. *See Sharpe*, 2022 WL 2127960, at *4.

Finally, Frierson faults the ALJ for failing to follow Social Security Ruling 12-2p,[45] which he says requires an ALJ to "consider a longitudinal record whenever possible as the symptoms of fibromyalgia can wax and wane where a person will have bad days and good days." Doc. 9, at 22. Ruling 12-2p "merely provides guidance on how to apply pre-existing rules when faced with a claimant asserting disability based on fibromyalgia." *Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 399 (6th Cir. 2016). Relevant to Frierson, it explains that in cases of fibromyalgia, "longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment." *See* Ruling 12-2p, at III.A.1. And under the Ruling, an ALJ "will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id.* at IV.D.

---

*e.g.*, Brief for Frierson, at 22, 24, *Overstreet v. Commissioner*, No. 1:21-cv-2062 (N.D. Ohio), ECF No. 9.

[45] *See* Soc. Sec. Ruling, SSR 12-2p; Titles II & XVI: Evaluation of Fibromyalgia, SSR 12-2p (SSA July 25, 2012). In this Report and Recommendation, I'll refer to this Ruling as Ruling 12-2p.

According to Frierson:

> In the instant matter, the ALJ failed to address the intermittent symptoms related to Frierson's MS. The record clearly established that Frierson had symptoms which were exacerbated by his other severe impairments. Failing to discuss all his symptoms related to the intermittent nature of his MS, including fatigue, was in error.

Doc. 9, at 22.

The ALJ's decision belies Frierson's assertion. The ALJ noted Ruling 12-2p and Frierson's medical history before determining that the record evidence "establish[ed] fibromyalgia as a medically determinable impairment in accordance with SSR 12-2p." Tr. 27. The ALJ then did what the Ruling requires; he reviewed the "longitudinal records," i.e., those "reflecting ongoing medical evaluation and treatment from acceptable medical sources," Ruling 12-2p, at III.A.1., and determined "the existence and severity of [Frierson's] impairment." *Id.*; *see* Tr. 27–34; Ruling 12-2p, at IV.D.

Frierson's second argument is meritless.

*Frierson's third issue*

Frierson's final issue concerns the fact that the ALJ ended Frierson's testimony during his remanded hearing after 45 minutes.[46] To understand Frierson's argument, it's necessary to consider the context in which it arose.

---

[46]    At the end of this argument, Frierson adverts to another argument: "[t]he ALJ failed to acknowledge [certain] deficiencies in his decision." Doc. 9, at 25. This "perfunctory" argument is "waived." *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

The ALJ presided at Frierson's first hearing in July 2019. Tr. 50–72. Frierson testified during that hearing and was examined by his counsel and by the ALJ. Tr. 51–65. At the conclusion of Frierson's testimony, the ALJ asked whether Frierson had "[a]nything else [he'd] like to say," and Frierson replied that he did not. Tr. 65. Later in July 2019, the ALJ ruled that Frierson was not disabled. Tr. 140–50.

In December 2020, however, the appeals council remanded and directed the ALJ to resolve two issues. Tr. 156–57. First, it noted that although the ALJ found persuasive the opinions of two state-agency psychological consultants, he did not adopt all their "assessed limitations as part of" Frierson's RFC or explain why the limitation weren't wholly adopted. Tr. 156–57. Second, the appeals council stated that the ALJ failed "to identify and articulate the persuasiveness of the opinion of treating psychologist, Walter Knake, Jr., Ph.D., that it is very difficult for the claimant to tolerate stress at any level." Tr. 157.

On remand, the ALJ held a hearing. During the remanded hearing, the ALJ admitted exhibits and turned the examination over to Frierson's counsel. Tr. 76. Forty minutes later, the ALJ informed counsel that he had five minutes left to complete his examination.[47] Tr. 90. And 3 minutes after that, the ALJ

---

[47]    The ALJ later explained that he gave counsel 45 minutes to conduct his examination. Tr. 92. If that's the case, and Frierson does not claim otherwise, then when the ALJ told counsel that he had 5 minutes left, 40 minutes had elapsed.

said there were 2 minutes left, before ending the examination after 45 minutes. Tr. 91–92.

With this background in mind Frierson, says that the ALJ's "egregious behavior … resulted in the inability for Frierson to be given a fair opportunity to present his evidence and legal arguments."[48] There are any number of problems with Frierson's argument. For starters, although Frierson's brief states an issue, provides a rule, factual background, and the above-stated conclusion, the brief contains no analysis. So while we know that Frierson thinks that the ALJ violated HALLEX[49] I-2-6-60, *see* https://www.ssa.gov/OP_Home/hallex/I-02/I-2-6-60.html, and we know what facts Frierson thinks support his conclusion, we don't know why he thinks those facts support his conclusion. Frierson has arguably forfeited this issue. *See Shqutaj v. Gonzales*, 158 F. App'x. 663, 665–66 (6th Cir. 2005) ("Where the petitioner's brief lacks legal or factual argument, this Court will not examine the record and construct an argument on petitioner's behalf.").

Putting aside Frierson's briefing deficiency, HALLEX "is not published in either the Federal Register or the Code of [FederalRegulations[] and does

---

[48] In support of his assertion, Frierson cites *Davis v. Comm'r of Soc. Sec.*, No. 16-13495, 2018 WL 3259791, at *12 (E.D.MI Feb. 12, 2018) for its citation, in turn, of *Corbett v. Comm'r of Soc. Sec.*, 2012 WL 2462298, at *4 (D.N.J. June 27, 2012). Doc. 9, at 24. *Davis* doesn't help Frierson. The court in *Davis* held that Davis received a "full and fair" hearing. 2018 WL 3259791, at *12.

[49] Improbably, HALLEX stands for Hearings, Appeals and Litigation Law Manual of the Social Security Administration.

not have the force of law." *Alilovic v. Astrue*, No. 1:12-cv-323, 2012 WL 5611077, at *7 (N.D. Ohio Nov. 15, 2012). So it's not binding on this Court, *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008), and is instead merely "an 'internal guidance tool' for use by ALJs and other [SSA] staff members." *Alilovic*, 2012 WL 5611077, at *7. Some courts, however, would afford relief based on an alleged HALLEX violation in cases where the claimant shows prejudice resulting from the violation. *See Bester v. Comm'r of Soc. Sec.*, No. 1:18-cv-156, 2019 WL 3037892, at *11 (S.D. Ohio June 26, 2019) (citing cases), *report and recommendation adopted*, No. 1:18-cv-156, 2019 WL 3037564 (S.D. Ohio July 11, 2019); *see also Connor v. U.S. Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983) ("an agency's violation of its procedural rules will not result in reversible error absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses").

The initial problem for Frierson is that the HALLEX provision on which he relies gives the ALJ the authority to "determine[] the subject and scope of testimony from a claimant and any witness(es), as well as how and when the person testifies at the hearing." HALLEX I-2-6-60(A). And although an "ALJ will provide a claimant or representative broad latitude in questioning witnesses … the ALJ is not required to permit testimony that is repetitive or cumulative." *Id*. at (B). Much as district courts "enjoy 'broad discretion' in placing limits on the presentation of evidence," *Ross v. Parrot's Landing, Inc*.,

49

No. 1:18-CV-725, 2021 WL 5767142, at *6 (W.D. Mich. Oct. 28, 2021), *aff'd*, No. 21-1774, 2022 WL 7367263 (6th Cir. Oct. 13, 2022), ALJs operating under HALLEX I-2-6-60 have discretion to place limits on testimony, *cf. Deus v. Allstate Ins. Co.*, 15 F.3d 506, 520 (5th Cir. 1994) ("In the management of its docket, the court has an inherent right to place reasonable limitations on the time allotted to any given trial.").

And even if Frierson had shown a violation of the SSA's internal rule, he founders on the question of prejudice. The closest Frierson comes to showing prejudice is his unadorned assertion that the ALJ denied him "a fair opportunity to present his evidence and legal arguments." Doc. 9, at 24. This is just a conclusion; Frierson offers nothing about what additional evidence he might have provided or how that evidence might have changed the outcome.

Notably, the Commissioner argues that Frierson's due process rights were not violated. Doc. 11, at 16–17. But Frierson neither mentions the Due Process Clause in his brief nor cites any caselaw about it. And even if Frierson had raised a due process claim, which he hasn't, he could not prevail. Frierson doesn't assert prejudice, an essential component of a due process claim. *Karst Robbins Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 969 F.3d 316, 329 (6th Cir. 2020). Moreover, the HALLEX doesn't define the process Frierson was due under the Due Process Clause. *See Davenport v. Astrue*, 417 F. App'x 544, 547–48 (7th Cir. 2011). Instead, under the Due Process Clause, Frierson was entitled to an opportunity to be heard, *Karst Robbins*, 969 F.3d at 329, which

50

he received, twice. It's true that the ALJ limited Frierson's testimony at his second hearing to 45 minutes, but Frierson provides no basis to conclude that the Due Process Clause's opportunity-to-be-heard requirement is open-ended.

Finally, Frierson adds that the ALJ argued with counsel near the end of the hearing. Doc. 9, at 25. Based on this interaction, Frierson offers that "[t]hese exchanges provide evidence that the ALJ failed in his duty to allow broad latitude in questioning witnesses and in allowing a final oral argument." Doc. 9, at 25 (citing HALLEX I-2-6-76). But Frierson doesn't affirmatively assert that the ALJ failed in his duty; rather he asserts that there is evidence that the ALJ did. And even if Frierson's observation qualifies as a milquetoast assertion, he (1) offers no analysis to support his assertion, (2) doesn't explain how the referenced interaction at the end of the hearing could have affected counsel's examination *that happened before the interaction*, (3) doesn't explain how the referenced interaction prevented his counsel from presenting oral argument, and (4) leaves it to the Court to discern what HALLEX I-2-6-76 requires or how the ALJ failed to live up to its mandate. Especially when a party is represented by counsel, it is the not the Court's job to construct arguments for a party. *See Brenay v. Schartow*, 709 F. App'x 331, 336–37 (6th Cir. 2017); *Lewless v. Sec'y of Health & Hum. Servs.*, 25 F.3d 1049, 1994 WL 201887, at *4 (6th Cir. 1994) (unpublished). Frierson "has waived this issue." *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 430 (6th Cir. 2014).

Frierson's third issue is meritless.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: March 6, 2023


*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).